Robert M. **ALTMAN** and Victoria L. Altman, his wife, Individually and as parents of minor children, Russell Altman and Ross Altman, Mary Ann Dibari, Individually and as lawful guardian of minor children Krystal M.

Dibari and Tiana N. Dibari, Joseph M. Dinozzi and Cecile D. Dinozzi, his wife, Individually and as parents of minor children, Jon M. Dinozzi, Daniel J. Dinozzi, Steven M. Dinozzi, and Joseph A. Dinozzi, Plaintiffs,

v.

**BEDFORD CENTRAL SCHOOL DISTRICT**, Dr. Bruce Dennis, in his capacity as Superintendent of Schools of the Bedford Central School District and Agent/Administrator of its Board of Education; Jane Doe (name unknown, post currently vacant), in his or her capacity as Assistant Superintendent in charge of Curriculum and Instruction for the Bedford Central School District and Agent/Administrator of its Board of Education, Deborah Timberlake, in her capacity as President of the Board of Education of Bedford Central School District, Board of Education of the Bedford Central School District, James Young, in his capacity as Principal of the Pound Ridge Elementary School, James Alloy, in his capacity as Principal of Fox Lane Middle School, and Richard Kraemer, in his capacity as Principal of Fox Lane High School, Defendants.

No. 96 Civ. 7791(CLB).

United States District Court, S.D. New York.

May 21, 1999.

---

James M. Bendell, Port Townsend, WA, Joseph P. Infranco, Miglore & Infranco, PC, Commack, NY, Christopher a. Ferrara, American Catholic Lawyers Assn., Fairfield, NJ, for plaintiffs.

Warren Richmond, Lawrence W. Reich, Neil Block, Ingerman, Smith, LLP, Northport, NY, for defendants.

### FINDINGS, CONCLUSIONS, and ORDER

BRIEANT, District Judge.

This action filed October 15, 1996 for declaratory and injunctive relief under the First and Fourteenth Amendments of the United States Constitution and Article I, § 3 of the New York State Constitution, and for redress of the Plaintiffs' rights under 42 U.S.C. §§ 1983 and 2000bb(b)(1); 20 U.S.C. § 1232(f); 34 C.F.R. § 98.1; 20 U.S.C. § 1232(h)(b); and 34 C.F.R. § 98.4. was tried before this Court without a jury on February 22, 1999, continuing on February 24, 1999, March 1, 2 and 4, 1999, concluding on March 4, 1999. Post verdict submissions were received on March 29, 1999. Subject matter jurisdiction is established pursuant to 28 U.S.C. §§ 1331 and 1343(3). The Court now makes its Findings of Fact and Conclusions of Law after Trial.

### The Parties

Plaintiffs Robert M. Altman and Victoria L. Altman are parents of minor children. They are residents and taxpayers in that portion of the Town of Pound Ridge which is within the area served by the Defendant Bedford Central School District. Their child, Russell Altman, age 14 at the time of trial, had attended Pound Ridge Elementary School until the fifth grade, but was removed by his parents by reason of the controversy set forth in the Complaint, and will attend St. Patrick's parochial school until the case is resolved. Ross Altman, a younger child of the Altman Plaintiffs, attended third grade at the Bedford Central School District, and is now also at St. Patrick's.

Plaintiff Mary Ann DiBari is also a resident and taxpayer, and legal guardian of her two granddaughters. Her granddaughter Krystal, age 15 at trial, attends Fox Lane High School. Formerly, she attended Fox Lane Middle School. Her granddaughter Tiana (Niki), age 14 at trial, attends Fox Lane Middle School. She attended Pound Ridge Elementary School in fourth and fifth grade.

Plaintiffs Joseph M. DiNozzi and Cecile D. DiNozzi, are the parents of Jon, Daniel, Steven and Joseph. The DiNozzi's are also resident taxpayers. Their child, Jon, age 17 at trial, was attending Fox Lane High School, and had attended Pound Ridge Elementary School. Daniel, age 15 at trial, was withdrawn by his parents from the Fox Lane Middle School in the Fall of 1995 and now attends parochial school, "where he will remain until the matters in controversy are resolved." (Complaint at 6(b)). Steven DiNozzi, age 13 at trial, attended the Pound Ridge Elementary School but was removed in September 1995 for the same reasons. Joseph DiNozzi, age 13 at trial, also attended the Pound Ridge Elementary School and was

likewise removed by his parents, to attend St. Patricks.

Defendants are the officials administering the Bedford Central School District, including the Superintendent of Schools, Assistant Superintendent in charge of curriculum and instruction, the President and Members of the Board of Education, and the Principals of the Elementary School, the Middle School and the High School. They are responsible for the curriculum, instructional materials and teaching practices attacked by this lawsuit.

*The Dispute*

Plaintiffs all allege that they are adherents of Roman Catholicism, "whose sincerely held religious beliefs have been violated" by the acts alleged in the Complaint, with further violations imminently threatened. Plaintiffs allege that they became aware of exposure of their children by the Defendants to, "objectionable activities on school premises, either without parental consent or under circumstances which render parental consent ineffective to protect Plaintiffs' children." (Complaint at 7). The Complaint pleads five separate claims or so-called "causes of action." Pleading facts common to all of the claims, Plaintiffs allege that a totality of "methodologies, exercises, materials and presentations" have been used, implemented and promoted by the School District, which violate the Free Exercise Clause of the First Amendment, or alternatively violate The Establishment Clause thereof. Particularly, Defendants are accused of having developed the so-called "Bedford Program" which allegedly involves, "the promotion of Satanism and occultism, pagan religions and a New Age Spirituality."

Detailed allegations in the Complaint which comprise 74 paragraphs, beginning at ¶ 20, concern the implementation of the Bedford Program, and teaching practices which are claimed to violate Plaintiffs'

rights and disparage their own religious faith. Little purpose will be served by detailing all the religious and quasi-religious events which Plaintiffs claim their children were compelled to join, nor by a complete reiteration of the Complaint. Some of the conduct complained of does not seem to have religious overtones, but much of it does. Other facts alleged are intrusive but apparently without religious connotations. The underlying facts are pleaded separately as violations of the Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution (First Claim); a violation of the Religious Freedom Restoration Act (Second Claim)[1]; and violations of Fourteenth Amendment parental and privacy rights (Third Claim). The Fourth Claim pleaded alleges a violation of Article I, Section 3 of the New York State Constitution, which essentially tracks the First Amendment to the United States Constitution. Separate discussion of this claim is unnecessary. The Fifth Claim pleaded alleges that to the extent federally funded programs are involved, 20 U.S.C. § 1232(h)(b), and 34 C.F.R. § 98.4 *et seq.*, commonly referred to as the Pupil Protection Rights Amendment, are also violated. The Sixth Claim alleges that psychological testing, examination and counseling and treatment of students is a health service for which prior parental consent is required under § 2504 of the New York State Public Health Law.

*Overview of the Case*

This is agenda driven litigation, from both sides. Plaintiffs' agenda is to obtain judicial adoption of a single standard for the treatment of religion in the school system:

> It has been the Plaintiffs' position all along that what this case is really about is applying the same draconian limitations imposed by the federal courts on

---

1. This Claim has been dismissed on the authority of *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)

decided on June 25, 1997 by our Supreme Court after this action was filed.

Judeo–Christian religious practice in the public schools to Eastern religions and religious-type practices.

(Plaintiffs' submission filed March 29, 1999, Doc. 68 at p. 8). Also, "without consistency in the application of the law, there is no law at all. This case is a plea to end a double standard of religious influence in the public schools and bring consistency." *Id.* p. 19.

Defendants' agenda is to defend and extend their premise:

A school district has a statutory obligation to prepare students to assume the responsibilities of citizenship. A cramped or stilted curriculum distorted to meet the heightened sensibilities of individuals such as Plaintiffs herein, necessarily deprives the students of the broader information base and experiences which they require in order to participate fully in today's society.

(Pretrial brief filed February 16, 1999 [Doc. 65 at 30].)

Litigation is a blunt, Procrustean and generally ineffective means to satisfy either of these goals. The proof at trial shows that there is no such thing as the "Bedford Program." At most, the proof shows that numerous activities, many of them random acts initiated by individual school teachers luxuriating in their academic freedom, may have offended the Establishment Clause or the Free Exercise Clause, or both. This Court lacks the power to reconstitute or to approve or disapprove an entire school curriculum, and could not as a practical matter administer any injunctive decree which would seek to enforce any such determination.

Furthermore, it is not the function of this Court to determine whether any particular school practice is "offensive to Catholic parents." This criterion was employed throughout the trial by the Plaintiffs' expert witness, Father Mitchell Chester Pacwa, a Roman Catholic priest belonging to the Society of Jesus. Since

1996, Father Pacwa has served as Assistant Professor of Sacred Scripture at the University of Dallas, Texas, Institute of Religious and Pastoral Studies.[2] With due respect to the witness, the issue in the case is not one of offensiveness to Catholic parents, but rather whether the conduct violates the Constitution. That there may have been some disparagement of the beliefs of Roman Catholics, Jews and Christians of other denominations seems apparent. The Court views with understanding and deep concern the idea that a public school system should be engaging in practices which are "offensive to Catholic parents," or for that matter offensive to any other members of the community served.

Public education generally is not among the responsibilities entrusted to the federal courts, nor is it a subject upon which we can claim any special expertise. This case concerns curriculum content. There is an understandable tension between majoritarian government and the desires of individuals to live and raise their children uncontaminated by government sponsored teachings which appear to them to be worthless or hostile to their religious beliefs. These forces clash readily in the area of education, where our nation has enjoyed a long history of encouraging families to take responsibility for the instruction of their own children, while at the same time, making school attendance compulsory and granting control of the curriculum to state and local officials.

The goal of local home rule is to allow communities to develop rules and regulations for the management—or mismanagement—of their own affairs, through forms of majority rule existing by the very nature of a republican form of government. An individual may disagree with a particular policy or rule implemented by duly elected local representatives within the scope of the responsibility entrusted to them. Ordinarily, that person must abide by the general law while attempting to

---

**2.** Representatives of the local parishes affect- ed by this litigation took no part in the case.

persuade others in the community to revise the policy or rule, or to elect new local representatives who will do so.

The Supreme Court has recognized the benefits of local responsibility for public education:

> [O]ne of the peculiar strengths of our form of government [is] each State's freedom to 'serve as a laboratory; and try novel social and economic experiments.' No area of social concern stands to profit more from a multiplicity of viewpoints and from a diversity of approaches than does public education.

*San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 50, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16 (1973) (Powell, J.) (quoting in part from the dissent of Justice Brandeis in *New State Ice Co. v. Liebmann,* 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747 (1932)). It is "long recognized that local school boards have broad discretion in the management of school affairs." *Board of Education Island Trees Union Free School Dist. No. 26 v. Pico,* 457 U.S. 853, 863, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (Brennan, J.).

New York, by § 1804(1) of the Education Law, makes applicable to a Central School District all powers granted to a Union Free School District except as otherwise provided, and by § 1709(3) of that law, the Defendant School Board controls the curriculum. See New York State Education Law § 1709(3) ("The said board of education of every union free school district shall have power, and it shall be its duty ... [t]o prescribe the course of study by which the pupils of the schools shall be graded and classified.").[3]

Accordingly, this Court must reject any consideration of whether any or all of the practices complained of are "offensive" to Roman Catholics or anybody else and approaches instead the more narrow issue of whether the First Amendment as construed by the Supreme Court of the United States and the Court of Appeals of this Circuit has been violated. We must leave the offensiveness for redress, if any there may be, to be taken at the polls at the next annual school election.

The relevant provisions of the First Amendment, the first of the Bill of Rights, read:

> Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof...

U.S. CONST. amend. I

It is clear that this amendment is made applicable to the states by the Fourteenth Amendment, and that any action by a school board, public school teacher or administrator is a state action within that Amendment, and actionable in this Court under 42 U.S.C. § 1983.

We know from history that this Amendment was passed in light of concern by Congress and the states that their new national government might at some future time follow the practices of European states in which the ruler for the time being presumed to dictate the religious affiliations of his subjects and interfere with the free exercise of their own conscience. We may not forget that "the men and women who left Scrooby for Leyden and eventually came to Plymouth in order to worship God where they wished and in their own way must have thought they had terminated the interference of public authorities with free and unhandicapped exercise of religion."[4]

---

**3.** If the so-called Bedford Program is as offensive to Roman Catholicism as Plaintiffs claim, it probably also offends other parents belonging to other denominations or having no religion. Such aggrieved persons may, if so advised, attend the annual meeting and elect persons of their choice to the School Board who will return the curriculum to basics, if that is what the people of Bedford and Pound Ridge desire.

**4.** Chief Judge Albert Conway writing for the New York Court of Appeals in *Matter of Community Synagogue v. Bates,* 1 N.Y.2d 445, 458, 154 N.Y.S.2d 15, 136 N.E.2d 488 (1956).

*Application of the First Amendment*

Plaintiffs assert that various activities of the so-called "Bedford Program" violate both the Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution, quoted, *supra.* Despite deriving from the same organic constitutional provision, the Supreme Court has emphasized a critical difference "between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Ed. of Westside Community Schools (Dist.66) v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990).

Early precedent on the Establishment Clause invoked the comment of Thomas Jefferson, that the clause was intended to erect "a wall of separation between Church and State." *Reynolds v. United States,* 98 U.S. 145, 162, 25 L.Ed. 244 (1878). This "wall" and the clause itself are the product of the "vivid mental picture of conditions and practices which [the original Colonists] fervently wished to stamp out in order to preserve liberty for themselves and for their posterity." *Everson v. Board of Ed. of Ewing Tp.,* 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Although analysis of government conduct under the Establishment Clause has been embellished considerably, for better or worse, since its inception over 200 years ago, some principles are clear:

Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

*Everson,* 330 U.S. at 15–16, 67 S.Ct. 504.

Over time, the basic thrust of the clause has remained one of government neutrality towards religion. *See Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 839, 115 S.Ct. 2510, 2521, 132 L.Ed.2d 700 (1995) ("[A] significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion."); *Board of Ed. of Kiryas Joel v. Grumet,* 512 U.S. 687, 696, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994) ("A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents.") (internal quotations and citation omitted).

Analysis of cases presented under the Establishment Clause has experienced rapid evolution over the past quarter century of our nation's history. The three-pronged test of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), endures as a starting point of Establishment Clause analysis despite premature reports of its demise. *See e.g. Hsu By and Through Hsu v. Roslyn Union Free School Dist. No. 3,* 85 F.3d 839, 864 n. 26 (2d Cir.), *cert. denied,* 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996). *Lemon* requires a challenged government practice (1) to have a secular purpose,[5] (2) to have a primary effect that neither ad-

---

**5.** A court should be deferential to the state's articulation of a secular purpose, but the secular purpose must be sincere and not a sham.

*Edwards,* 482 U.S. at 586–87, 107 S.Ct. at 2579.

vances nor inhibits religion, and (3) not to foster excessive state entanglement with religion. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105.

*The Endorsement Test*

In *Lynch v. Donnelly,* 465 U.S. 668, 688–693, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring), Justice O'Connor suggested that the Court refine the *Lemon* test by interpreting the second prong of the *Lemon* test into an "endorsement test." Under this analysis, the challenged conduct impermissibly endorses religion if it has either the purpose or effect of communicating a message of government endorsement or disapproval of religion. 465 U.S. at 691–92, 104 S.Ct. 1355. In considering the conduct's effect, the question of endorsement is evaluated from the perspective of a "reasonable observer." *See Wallace v. Jaffree,* 472 U.S. 38, 76, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring).

In *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), a creche case, the particular display was held to violate the Establishment Clause, but the Court held that display of a Menorah next to Christmas tree did not have the unconstitutional effect of endorsing Christian or Jewish faiths. The Supreme Court recognized the endorsement test, which "precludes government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred." *Id.* at 593, 109 S.Ct. 3086 (internal quotations marks and alterations omitted). In *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the Supreme Court took its closest step towards overruling the *Lemon* test in favor of the endorsement test. In holding that it was constitutional for public school teachers in New York State to provide remedial education to disadvantaged children attending parochial schools, the Court entrusted the district courts with evaluating on a case by case basis whether the challenged government activity had the effect of advancing religion. 521 U.S. at 234, 117 S.Ct. 1997.

Our Court of Appeals, in *Marchi v. Board of Cooperative Educational Services of Albany,* 173 F.3d 469 (2d Cir. 1999), held recently that it would adhere to *Lemon* but would add the *Agostini* analysis to its Establishment Clause framework. *See also Hsu By and Through Hsu v. Roslyn Union Free School Dist. No. 3,* 85 F.3d 839, 864–67 and n. 26 (2d Cir.), *cert. denied,* 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996) (applying the *Lemon* test in a school-related Establishment Clause case, but "not[ing] that the critical factor" was the endorsement test).

*The Coercion Test*

In *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), a case involving the recital of a prayer by a member of the clergy at a high school graduation ceremony, the Supreme Court declined an invitation to reconsider *Lemon.* The Court, instead, held that under the First Amendment, "[i]t is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to ... participate in religion or its exercise...." *Id.* at 587, 112 S.Ct. 2649. Even a "subtle coercive pressure" by a government official to engage in religious activity may violate the First Amendment. *See id.* at 591, 112 S.Ct. 2649. It is of special significance to our consideration of the instant case that the Court in *Lee* placed great weight on protecting impressionable students:

As we have observed before, there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools. *See, e.g., School Dist. of Abington v. Schempp,* 374 U.S. 203, 307, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring); *Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987); *Board of Ed. of Westside Com-*

*munity Schools (Dist.66) v. Mergens,* 496 U.S. 226, 261–262, 110 S.Ct. 2356, 2377–2378, 110 L.Ed.2d 191 (1990) (Kennedy, J., concurring). Our decisions in *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), and *School Dist. of Abington,* supra, recognize, among other things, that prayer exercises in public schools carry a particular risk of indirect coercion. The concern may not be limited to the context of schools, but it is most pronounced there. *See County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. at 661, 109 S.Ct. at 3137 (Kennedy, J., concurring in judgment in part and dissenting in part). What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy.

505 U.S. at 592, 112 S.Ct. 2649

The Supreme Court first considered impressionable students in connection with Establishment Clause analysis in *Edwards v. Aguillard,* when the Court declared unconstitutional Louisiana's "Creationism Act" which forbid the teaching of the theory of evolution in public elementary and secondary schools unless accompanied by instruction in the theory of "creation science." The Court considered the effect on the impressionable young students of factors such as mandatory attendance, the students' emulation of teachers as role models and the children's susceptibility to peer pressure. 482 U.S. at 584, 107 S.Ct. 2573.

This concern over impressionable youth has often been relied on by the Supreme Court to invalidate statutes which appear to advance religion in public elementary and secondary schools. *See, e.g., Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29, (Alabama statute authorizing moment of silence for school prayer);

*Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (posting copy of Ten Commandments on public classroom wall); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (statute forbidding teaching of evolution); *School Dist. of Abington v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (daily reading of Bible); *Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601 (1962) (recitation of "denominationally neutral" prayer).

Because this case affects elementary and secondary public school children of young and impressionable age, our analysis of the questioned practices of the school district should proceed under the "coercion test." The Court in *Edwards* observed that although "states and local school boards are generally afforded considerable discretion in operating public schools ... the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." 482 U.S. at 583, 107 S.Ct. 2573 (internal citations omitted). Justice Brennan's opinion in *Edwards* expresses the problem facing this Court: "Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family.... '[T]he public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools....'" 482 U.S. at 584, 107 S.Ct. 2573 (citing *Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, 231, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948) (opinion of Frankfurter, J.)).

Any First Amendment analysis invokes the threshold question: what is religion? Plaintiffs' complaint challenges both school district activity concerning recognized religions such as Hinduism, as well as Earth

worship, the new age religions, superstition,[6] and the occult.[7] The Supreme Court has observed correctly, that "religion is not defined in the constitution," *Reynolds v. United States,* 98 U.S. 145, 162, 25 L.Ed. 244 (1878). While engaged in refining continually its own standards for First Amendment analysis, the Supreme Court has declined or failed to provide the district courts with a working definition of "religion." *See* James M. Donovan, *God is as God Does: Law, Anthropology, and the Definition of "Religion",* 6 Seton Hall. Const. L.J. 23 (1995). This Court remains mindful of the words of Justice Potter Stewart who when faced with the challenge of defining obscenity in the context of a different First Amendment right, could say no more than "I know it when I see it." *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring.).

■ Since neither the Supreme Court nor the Second Circuit have defined religion in the constitutional sense, this Court will apply the approach adopted by the Third Circuit, *Malnak v. Yogi,* 592 F.2d 197 (3d Cir.1979) (Adams, J., concurring), *adopted by Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025, 1031 (3d Cir. 1981), *cert. denied,* 456 U.S. 908, 102 S.Ct.

1756, 72 L.Ed.2d 165 (1982), and also applied by the Ninth Circuit. *See Alvarado v. City of San Jose,* 94 F.3d 1223 (9th Cir.1996). The test devised by Judge Adams of the Third Circuit is as follows:

· First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in. nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Africa,* 662 F.2d at 1032 (citing *Malnak,* 592 F.2d at 207–210). The "formal and external signs" listed by the court include: "formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays ·and other similar manifestations associated with the traditional religions." *Malnak,* 592 F.2d at 209.

### Free Exercise Clause

■ The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all "governmental regulation of religious beliefs as such." *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 10

**6.** Superstition is defined as "1 a: a belief, conception, act, or practice resulting from ignorance, unreasoning fear of the unknown or mysterious, morbid scrupulosity, trust in magic or chance, or a false conception of causation [the superstition that a black cat ·crossing one's path portends bad luck] [superstition such as · child-sacrifice, divination, soothsaying, enchantments, sorceries, charms (by magic knots, spells or incantations), ghosts, spiritualistic mediums, necromancy] **b:** an irrational abject attitude of mind toward the supernatural, nature, or God resulting from such beliefs, conceptions, or fears **2 a:** idolatrous religion **b:** idolatry [An alien religion whose superstitions and ritual were regarded with abhorrence] **3: a** fixed irrational idea: a notion maintained in spite of evidence to the contrary." WEBSTER'S THIRD NEW INTERNATIOAL DICTIONARY 2296 (1993)

**7.** ˙Occult is defined as "**1:** deliberately kept hidden: not revealed to others: secret, undis-

closed <too occult to be shown to uninitiate eyes> <deep subterranean occult jealousy> **2:** not to be apprehended or understood: demanding more than ordinary perception or knowledge: abstruse, mysterious, recondite <as far as the general public was concerned, the museum was an esoteric, occult place> <occult matters like nuclear physics, radia-˙tion effects and the designing of rockets> <the occult properties of the ductless glands> **3 a:** hidden from view: not able to be seen: concealed <the silica may appear in crystalline form ... or it may remain occult in the ground mass> **b** *archaic :* of or relating to lines drawn in dots or meant to be erased **4:** of, relating or, or dealing in matters regarded as involving the action or influence of supernatural agencies or some secret knowledge of them <deals in the occult arts> <an occult fortune-teller>." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1560 (1993).

L.Ed.2d 965 (1963). The government may not compel affirmation of religious belief, *see Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), punish the expression of religious doctrines it believes to be false, *United States v. Ballard,* 322 U.S. 78, 86–88, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), impose special disabilities on the basis of religious views or religious status, *see McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978); *Fowler v. Rhode Island,* 345 U.S. 67, 69, 73 S.Ct. 526, 97 L.Ed. 828 (1953); *cf. Larson v. Valente,* 456 U.S. 228, 245, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), or lend its power to one or the other side in controversies over religious authority or dogma, *see Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 445, 452, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 95–119, 73 S.Ct. 143, 97 L.Ed. 120 (1952); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 708–725, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

■ In *School District of Abington v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963), the Supreme Court described the Free Exercise Clause as follows:

> Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion.

Our Court of Appeals has applied this "coercion" test when analyzing whether a challenged practice within the field of public education infringes on a plaintiff's free exercise rights. *See Smith v. Board of Education, North Babylon Union Free School District,* 844 F.2d 90, 92 (2d Cir. 1988). The coercion can be either direct or indirect, *see Hobbie v. Unemployment Appeals Commission of Florida,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987), and must infringe on the Plaintiff's ability to receive an "important benefit" from the state at the expense of the Plaintiff's right to the free exercise his or her religion. *See Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981) ("[W]here the State conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists."). In *Smith,* the only recent Second Circuit case adjudicating a free exercise clause challenge against the actions of a public school, our Court of Appeals did not reach the ultimate issue of whether the school's interest was overriding or compelling. In *Smith,* an Orthodox Jewish high school senior sought to enjoin the Defendant Board of Education from scheduling his high school graduation on Saturday, when he would be unable to attend due to his strict observance of the Jewish Sabbath. 844 F.2d at 91. The Court of Appeals held that since Smith did not have to attend graduation in order to receive his diploma, the school was not denying him an important benefit protected by the Free Exercise Clause. *Id.* at 94.

■ At issue in this litigation is both the students' right to exercise their own religious beliefs free from state coercion, as well as the right of the parents to control the religious upbringing and training of their minor children. *See Wisconsin v. Yoder,* 406 U.S. 205, 230–231, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In analyzing the coercive effect the challenged conduct has on the Plaintiffs, it is improper for the Court to evaluate the sincerity of an individual's religious beliefs, *see United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), however, the Court is required to inquire into the relative importance of a particular religious ritual and degree to which exercise of that practice is infringed by government action. "The

state may, however, justify any such limitation on religious liberty by showing that its action is essential to accomplish an overriding or compelling governmental interest." *Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855, 868–69 (2d Cir. 1988), *cert. denied,* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989).

*Specific Claims of Plaintiffs*

As noted earlier, the proof at trial fails to confirm the existence of any "Bedford Program." There may be a "Bedford Attitude" which is negative towards the desires of Plaintiffs to permit their children to opt out of specific programs or school practices they deem hostile or offensive. At most, Plaintiffs' evidence shows a large number of separate claims of Constitutional violations, some of them trifling, which this Court must resolve on the facts and the law as separate controversies. As to some of them, the proof fails to support the allegations. Others present random acts initiated by individual teachers or others, which were not directed or authorized in advance by school district policy, but are now defended as of extreme significance to a broadened education. We consider them separately below.

*Magic—The Gathering*

■ "Magic: The Gathering" (Defendants' Exhibit 7) is a strategic, adventure-style, math-oriented, card game that was played by students at the Pound Ridge Elementary School and the Fox Lane Middle School as part of extracurricular clubs. Students were permitted to play the game on school premises only as part of clubs that met before school started at the elementary school, and after school at the middle school. Participation was allowed only with prior written parental consent, and the school made a reasonable effort to provide adequate information to permit parents to make an informed decision (Defendants' Exhibit 27). The clubs were supervised by a parent at the elementary school and by a teacher at the middle school. These supervisors were in attendance strictly for safety reasons, and did not take part in the activities of the clubs. Following plaintiffs' initial complaints about the game, the school district placed a thirty day moratorium on the activity until the district could make a more informed decision about the nature and content of the game. After receiving the opinions of several mental health professionals, the school district lifted the moratorium.

However, the game is not played currently at either school. Dr. Dennis testified that the clubs would be reinstated only if the students expressed interest in resuming the activity. (Tr. 345). Only acting upon such a request, would the school district then attempt to obtain adult supervision. The middle school teacher who supervised the club has since retired and the parent who volunteered has found employment and is no longer available. *Id.* The school district asserts the right to reinstate this extracurricular activity at any time if it decides to do so, and asserts that playing the game improves math and other skills.

Dr. Dennis testified on direct examination (Tr. 341–42):

Q. (By the Court) What do you understand the purpose of the game to be?

A. The game is a game that's based on mathematical principles and contains images on cards which ostensibly have some power that gives the student or the child who is manipulating the cards the ability to gain his opponent's trading cards in return.

Q. (By the Court) Is there some written direction about how you play the game?

A. Yes, there is extensive direction, and there are books. This is a game that's been played on college campuses. Mensa had selected it as one of its top ten games during the year that it came out, and it's a

game that typically attracted the most academically talented kids. They seemed to be drawn to the game. But I have no particular fondness for the game itself.

Q. (Direct examination) Isn't it true that your own son tried to teach you the game?

A. My own son played the game. It was beyond me. But yes, he did try to teach me.

Q. You don't really know how to play the game, do you?

A. I've watched the game played. I've watched students in the school. When I placed a moratorium on the game because the plaintiffs had contended that the game was harmful, I sent for materials from the publishers so we could provide them to the mental health professionals who reviewed the game. I reviewed the game.

I had six middle school boys come to my office to let me observe them while they played the game. I have been to a tournament that was held in a church in Bedford where the game was played. So I have a rudimentary understanding of the game, and I've certainly seen all the images on the cards in the entire series.

The Court, like Dr. Dennis, finds the game of "Magic: The Gathering" somewhat arcane to say the least. It was first published nationally in 1993 by Wizards of the Coast, Inc., located, naturally, in California, and is now in its 6th Edition. Defendants' Exhibit 1 is a game set for two players, which includes two sets of playing cards. One player is designated the Wizard Zakk, and the other Wizard Kazz. A player starts with the life total of 20, and wins the game when he or she has reduced the other player's life to 0. There are other versions for multiple players, including 16 expansion sets and 6 versions of the base game.

Drawing certain cards allows a player to cast different types of "spells" including the ability to summon Sprites or a Unicorn. The directions for the resultant one-to-one combat between the players are both intricate and weird. To describe them would prolong this work unduly. The cards include graphic illustrations of zombies, goblins, a lost soul, elven riders (mounted on wolves), "artifacts," a sorceress queen, a wraith, an imp, murk dwellers, vampires, a wall of human bones, a whirling dervish, a unicorn, a skull, Pegasus, a grizzly bear and some other cards which are entirely free from references to the supernatural. No reasonable person could regard sponsoring this game as a teaching of religion.

Although it has been stipulated that "Magic: The Gathering" contains cards that are offensive to people of the Catholic faith, this Court declines on the totality of the evidence to find that the school district's conduct was in violation of the First Amendment. The game is played with a large number of cards containing unrealistic fantasy representations, which are obviously fictitious and imaginary, but it is neither overtly nor implicitly religious. As the game itself is not religious in nature, Plaintiffs' argument that the Defendants by allowing this extracurricular activity are advancing or promoting Satanism as a religion or the occult also fails. Furthermore, since participation was voluntary and permitted only with written parental consent, and not during school hours, this Court finds that the school district neither asserted coercive pressure for students to participate in the game, nor did it infringe on plaintiffs' right to the free exercise of their religion.

Assuming, solely for the argument, that Magic: "The Gathering" was religious in nature, the evidence shows, and the Court finds, that no reasonable observer or participant could believe that the school district's actions communicated a message of endorsement of the beliefs, if any, contained within the game. To the contrary,

the school district's precautions to present the club as a mere extracurricular activity not endorsed by the school, but simply offered on school grounds not during school hours, is consistent with the Supreme Court's decisions on the interplay between the competing principles of Free Speech, Free Exercise, and Establishment clauses of the First Amendment. *See e.g. Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

*Lord Ganesha*

█ Mrs. Reizes, during her fourth grade class in 1992–93, read her students the story, "How Ganesha got his Elephant Head," (Plaintiffs' Exhibit 31), then had her students construct likenesses, in paper, (Plaintiffs' Exhibit 12) of Ganesha.[8] Plaintiff Krystal DiBari was in Mrs. Reizes' fourth grade class in 1992–93.

The fourth grade lessons were part of a school-wide international enrichment theme week in which the teacher of each class selected a country for students to study and then share their experiences with students in the other classes. Mrs. Reizes chose to teach about India because the goal of the enrichment week was to supplement the curriculum with music, art, dance, and cooking and she believed India provided an interesting culture that would lend itself easily to such goals with the use of craft projects, background music, and the like. Mrs. Reizes established an elaborate lesson plan and classroom environment to foster the learning of the Indian culture, not the Hindu religion. The classroom was decorated with several travel posters of India and textiles and fabric of Indian design. Lessons on geography and culture were complimented with activities such as: instructions on how to make batiks (regional hand-printed textiles) out of wax and dye; cooking Indian food based on recipes in a *Time–Life Cooking of India* cookbook; making paisley designs (as paisley originated in Kashmir, India); constructing mosaics out of beans (Defendants' Exhibit 13); and replicating an Indian board game (Defendants' Exhibit 14). One afternoon (Tr. 666) was spent reading the story "How Ganesha got his Elephant Head." (Plaintiffs' Exhibit 31). This reading was followed by a companion art & craft project of constructing a paper image of Ganesha.

In 1993–94, Mrs. Reizes conducted a social studies unit on India as part of her third grade class. Plaintiffs Joseph DiNozzi and Tiana DiBari were a part of this class. The New York State Education Department Third Grade Social Studies curriculum, "Communities Around the World," (Defendants' Exhibit 20), provides specifically for a unit on Bombay, India (now Mumbai) (Defendants' Exhibit 20 at p. 225). This prototype unit discusses the Ganesha festival as a "tradition[ ] that Bombay's people are intent on preserving." *Id.* A suggested curriculum reading is "The Story of Rama and Sita," which is an excerpt from one of India's greatest writings, the epic poem called *The Ramayana. Id.* at 226, 229.

One of the suggested follow-up exercises to the reading of this story is the making of monkey stick-puppets, based on the Monkey King who is a hero in "The Story of Rama and Sita." *Id.* at 233. Mrs. Reizes herself decided to substitute the story, "How Ganesha got his Elephant Head," (Plaintiffs' Exhibit 31) for the "The Story of Rama and Sita," and modified the follow-up exercise from the monkey project to a project of constructing an image of

---

8. Ganesha, an elephant-headed Hindu God, is a subsidiary figure in modern Hinduism. He is the first god invoked at the beginning of worship or a new enterprise, and his image is often seen at the entrance of temples or houses. He is a patron of letters and learning and is considered the remover of obstacles. A festival for celebrating his birth falls on the fourth day of the lunar month Bhādrapada (August–September) and is observed with particular enthusiasm in the state of Mahārāshtra. 5 THE NEW ENCYCLOPÆDIA BRITANNICA 109–110 (15th ed. 1995).

Ganesha out of clay.[9] The evidence at trial confirms that this project was never started, as the school day ended before the class could begin construction; the project was disregarded the next day. (Tr. at 97, 105–107, 144–145) The Court finds no credible evidence to support plaintiffs' claims that Mrs. Reizes instructed the students to bring food or other gifts to Ganesha.

Mrs. Reizes also displayed in her classroom handwritten signs and pictures of Ganesha, one of which reads as follows:

Ganesha's head was accidentally cut off when he was a child. Shiva, in a panic, replaced it with the first head he found—an elephant's head.[10]

Ganesha is a round-bellied, good-natured Hindu God. He loves to eat.

Those who worship Ganesha bring him gifts of fruit.

Ganesha is the god of wisdom and success. People pray to him before they begin important projects.

(Plaintiffs' Exhibit 31).

Contrary to Mrs. Reizes testimony, her substitution of the story, "How Ganesha got his Elephant Head," (Plaintiffs' Exhibit 31) for the "The Story of Rama and Sita," plainly is not suggested by the New York State curriculum (Tr. 642, 653). These lesson plans were not part of the official New York State curriculum, but rather, like so many of the other challenged "Bedford Program" activities, are the product of one teacher's unilateral and idiosyncratic decision to do something, without prior consultation with or direction by the Superintendent, the Principal, or the School Board.

The evidence supports, and the Court finds, that Mrs. Reizes' only purpose in teaching about Ganesha was to educate her students about the Indian culture and society. Although Lord Ganesha is a deity

of the modern Hindu religion worshiped by hundreds of millions of people, reading a story common to the Indian culture, as part of an innovative, structured lesson plan about a foreign country and its culture, does not have the purpose or effect of advancing or inhibiting religion. Hinduism has religious, social, economic, literary and artistic aspects that combined form an intricate part of the Indian culture, knowledge of which is beneficial to the students and consistent with a diverse educational experience. Considering the relative amount of time that Mrs. Reizes spent on reading the Ganesha story, this challenged activity should be seen as neither advancing or promoting the Hindu religion, but simply educating students about the Indian culture. *See Abington v. Schempp,* 374 U.S. at 225, 83 S.Ct. 1560 (study of religion as part of secular program of education is consistent with the First Amendment). Likewise, in the context in which the story was read, the Court finds no indicia of any subtle coercive pressure to engage in the Hindu religion.

This subtle coercive pressure is found, however, in the classroom projects of constructing images of Ganesha. It is merely fortuitous that the third grade students never actually made the clay images of Ganesha, as instructed, because they ran out of time. While reading the Ganesha story can be part of a neutral secular curriculum, this Court fails to find any educational justification for telling young impressionable students to construct images of a known religious god. This part of the lesson, however benign in purpose or intent, has the appearance to a child of that age that the school is communicating a message endorsing Lord Ganesha and the Hindu religion. Equally impermissible under the First Amendment is the subtle

9. According to legend, Ganesha was made of clay by his mother Parvati, a Hindu goddess and wife of Shiva.

10. This part of the story was factually incorrect. Shiva's attendants cut off Ganesha's

head in battle. To ease Parvati's grief Shiva promised to cut off the head of the first living creature that he came across and join it to the body. This was an elephant. *Encyclopedia Britannica,* cited *supra.*

coercive pressure of instructing young impressionable students to make images of a god other than their own in violation of their religious beliefs. Father Pacwa testified, without contradiction, and reported in Plaintiffs' Exhibit 73, that it is a violation of the First Commandment and Catholic teaching, for Catholics to fashion images of false gods.[11] Thus, this practice is a violation of the First Amendment and plaintiffs are entitled to appropriate relief on this point.

It should be simple to draw and conform to a line between the two challenged activities concerning Lord Ganesha. Permitting a school teacher to read a religious based story to students as part of a secular program is far removed from directing the same students to create a likeness or graven image of a god. The apparent benign appearance of the paper Ganesha image that was constructed in Mrs. Reizes' class (Plaintiffs' Ex. 12) is of no relevance. Of course a teacher, without violating the Constitution, could instruct her class to make a paper image of an elephant after the class reads the story of Babar or Dumbo. At issue here is not a "silly,"[12] third grade level image of an elephant with a crown (Plaintiffs' Ex. 12) but rather a teacher instructing or encouraging a student to construct an image of a religious deity worshiped today by many. In contrast, the Monkey King featured in the exercise initially suggested by the New York State curriculum and rejected by Mrs. Reizes does not appear to have any religious significance.

The Court concludes that appropriate relief is warranted based on the fact that the school district fails to recognize the severity of this violation. Dr. Dennis, the Superintendent, testified that he believes that it is unreasonable for parents to object to having their children instructed to make images of a religious figure in class. (Tr. at 351). Likewise, James Young, the principal of the Pound Ridge Elementary School during the relevant time frame of the challenge activity, testified that he had no problem with third and fourth graders making images of a Hindu god in class. (Tr. at 304, 317). The Constitution provides otherwise.

*School Sponsorship of the Worry Dolls*

■ There are five Worry Dolls in evidence as Defendants' Exhibit 1. These were sold at a school store. The Worry Dolls are about 1 1/4" high and appear to be made out of toothpicks, thread and wire, painted in bright colors, and put together with glue, with a painted face. In addition, Worry Dolls were made and painted by the students under school sponsorship as projects in the Discovery Center at Pound Ridge Elementary School. When Joseph DiNozzi was in the 4th grade, he made Worry Dolls and personnel in the school store told him and other students that if they put the dolls under their pillow at night, "[i]t would chase away your bad dreams." (Tr. 91)

Ross Altman testified that in addition to the operator of the school store, a teacher Mrs. Reizes, told the students in class that they could put the Worry Dolls under their pillows, "and take all our worries away and, dream." (Tr. 284, 287) We note that Mrs. Reizes denied that she herself had anything to do with the Worry Dolls, but there is sufficient evidence that someone acting for the school district allowed the Worry Dolls to be made in class, and that

11. I am the Lord thy God, who brought thee out of the land of Egypt, out of the house of bondage. Thou shalt not have strange gods before me. Thou shalt not make to thyself a graven thing, nor the likeness of any thing that is in heaven above, or in the earth beneath, nor of those things that are in the waters under the earth. Thou shalt not adore them, nor serve them. I am the Lord thy God, mighty, jealous, visiting the iniquity of the fathers upon the children, unto the third and fourth generation of them that hate me. And shewing mercy unto thousands to them that love me, and keep my commandments. First Commandment, in *Exodus* 20: 2–6, 1941 Douay Tr.

12. Testimony of Dr. Dennis (Tr. 463).

they were available at the school store, and the students were informed as to their intended use. The business with the Worry·Dolls is a rank example of teaching superstition to children of a young and impressionable age. It assumes that an inanimate object has some occult power to relieve us from worry and assure a good night's sleep. Father Pacwa testified, without contradiction, and reported in Plaintiffs' Exhibit 73 that the use of charms is forbidden by scripture and is an offense against the First Commandment. As Father Pacwa testified, "[t]he recent Catholic Catechism ... [prohibits] all forms of divination, magic and sorcery." (Tr. 600).

The sponsorship by the school of the Worry Dolls by selling them in the school store, or encouraging students to make them in class or in the discovery center, and use them for relief from worry, is a violation of the First Amendment. It prefers superstition over religion. Plaintiffs are entitled to appropriate relief on this point.

*Yoga Exercises*

■ Although yoga practices are widely accepted in the western world, simply for their exercise benefits, Plaintiffs take the position that yoga originates as a practice of the Hindu religion and is a form of idolatry.

Yoga exercises were conducted at the school by the witness Agia Akal Singh Khalsa, who is a Sikh, and testified at trial (Tr. 431, *et.seq.*) Sikh Khalsa has a trademark name of "the Yoga Guy." Sikh Khalsa also has a web site and practices numerology, an occult practice with religious overtones, having to do with purported analysis of the cycles and transit patterns of a person's life. Sikh Khalsa went only to the high school, not the elementary school. He was retained by Ken Edwards, the Athletic Director, and apparently came into the program as the result of another random act initiated by an individual teacher, without any prior consultation on the part of the Principal, the Superintendent, or any action or approval by the School Board.

Sikh Khalsa testified, and I find that in hiring him Mr. Edwards made clear that he "wasn't there to teach anything more than a stress reduction exercise." The evidence at trial fails to show that the Yoga Guy made any effort to teach religion or foster any religious concept or idea connected with Yoga. It was simply a breathing and relaxation exercise presented by the witness, who arrived at school dressed in a turban and the customary garb of a Sikh minister. There is evidence that Plaintiffs' children, on request, were allowed to opt out of the yoga exercise.

The Court finds as a matter fact that on the totality of the evidence, although the presenter was dressed in a turban and wore the beard of a Sikh minister, he did not in his yoga exercise presentation advance any religious concepts or ideas. There was no Constitutional violation, and as noted, in any event, Plaintiffs and others were permitted to opt out. Plaintiffs are entitled to no relief in connection with their claims concerning the yoga exercise.

*Crystal Power*

■ Plaintiffs claim that during a demonstration at school, elementary school children were told that crystals (rocks) had supernatural powers and could affect their mental state and heart rate. This practice is said to constitute a fostering by the school district of practices of superstition and idolatry in violation of Plaintiffs' rights under the Establishment Clause.

This claim arises out of a visit to the school by the witness Harvey Brickman, who describes himself as "the Rock Hound." He attended the Pound Ridge Elementary School on February 2, 1995, at Mr. Nolan's class, and at Ms. Hovey's class on the following day. He spoke to four different classes of fourth grade students. Here again, the presence of the Rock Hound is the result of a random act initiated by an individual teacher which seemed to have no basis in any policy

determination by the school district, or any decision by the Principal or the Superintendent. A teacher, Carol Hovey, attended one of Mr. Brickman's lectures on rocks and minerals, and asked him if he would give the same lecture at the school.

Mr. Brickman, a retired financial analyst with General Electric, is a rock collector and a member of clubs consisting of others interested in rock collection. He wears a fancy vest, which identifies him as a member of the Stamford Mineralogical Society, and his clothing is festooned with pins, rocks and other indicia of his avocation which he has collected over the years. The purpose of the Stamford Mineral Society is the collection of intelligence about rocks, minerals and fossils. This includes the collection of crystals, which he describes as pure rocks having varying characteristics. He has given between fifty and one hundred similar presentations at schools and in doing so has followed substantially the same script.

Mr. Brickman testified, and I find, that he gave a traditional presentation of information concerning various minerals, their relative hardness, and some other characteristics and also made available samples of rocks which he had collected to be examined by the students.

Some of the students brought their own rock collections to class, and he helped identify rock samples. Students were allowed to touch the rocks, and to wear jewelry containing certain of the rocks. The exhibition included amethyst crystals, tourmaline crystals, garnet, and beryl crystals, and he wore a necktie with pyrite. He denied that he himself believes that crystals have supernatural powers, and expressly denied under oath the accusation that he had told the students that putting a crystal next to their heart would make their heart beat faster (Tr. 729). Mr. Brickman testified in response to the question, "Did you tell the children some people believe that crystals have power?" by answering as follows, "I may have been asked if I thought that crystals had pow-

ers, and I may have told them some people believe it, but I thought it was ludicrous." (Tr. 731) This was not a part of the planned presentation, but the witness testified that if asked he would have so responded. He concedes that he has given out samples of crystals to the children.

Father Pacwa's testimony to the effect that Roman Catholics are forbidden to engage in the practice of using crystals as if they had mystical power over the body is undisputed. Also undisputed is his opinion that "such superstition is a form of idolatry, which is a grave sin." There is, however, a failure of proof that the scope of the lecture went beyond telling the students that "some people believe." To describe the religious beliefs of some persons without endorsing those beliefs does not violate the First Amendment. The Court notes that throughout the case Plaintiffs have relied upon the recollection of young students of impressionable age as to single events in their lives which occurred several years earlier and were the subject of concerned discussion with parents, grandparents, guardians and lawyers over a lengthy period. Russell Altman testified that Mr. Brickman had said that if you put a crystal on your heart or on your forehead "you can wish and want more and your dreams will come true." (Tr. 276). He was also quoted by the student as saying that the crystal around his neck was very sacred to him. The Court accepts Mr. Brickman's version as more worthy of belief. Indeed, the credibility of all students who testified on both sides of the case is suspect. Not because of their tender years, or because this Court believes they had a desire to lie, but because they are all interested in the outcome of the case, affiliated in some way with one side or the other of the case, and more importantly they are being asked to recall events in the past which obviously have been the source of considerable discussion and controversy both at home and in their dealings with the lawyers.

Under our legal analysis set forth earlier, the Court agrees that it would have

been a violation of the First Amendment if the visiting lecturer, Brickman, had taught the students that the crystals have occult or supernatural power. He did not. Plaintiffs are entitled to no relief in connection with their claims concerning the Rock Hound.

*The Life of Buddha*

There was evidence that one teacher read to the students an account of the life of Buddha. The argument by Plaintiffs is that "[i]f public school children cannot be shown a video of the life of Christ they cannot be read the life of Buddha by their own teacher." (OPCAL, Doc. No. 66, filed February 22, 1999.)

In the first place, it is not clear that public school children could not be told of the life of Christ. Certainly it could be done lawfully without sponsorship, merely as an exercise in history or for the study of comparative religion. There is a failure of proof that reading the life of Buddha was conducted in such a fashion as to sponsor belief in Buddha or to violate the First Amendment rights of Plaintiffs. Absent a promotion of religion by the school, it is permissible to read the life of Buddha to the students. Plaintiffs are entitled to no relief in connection with their claims concerning Buddha.

*Quetzalcoatl*

Fourth grade students were read a story about Quetzalcoatl that was part of a historical presentation concerning Mexico. There is no evidence that the teacher, Mrs. Pappace, who testified at trial, promoted belief in Quetzalcoatl as a religion. One of the students made a Quetzal Bird out of cardboard, paper and pipe cleaners, and a diorama was made showing human sacrifice by the Aztecs.

On the balance of the evidence, the Court concludes that no student was compelled to make a physical representation of Quetzalcoatl, that the teachings were consistent with the New York State curriculum and represented a comparative presentation of ancient religious customs consistent with the purpose of the instruction. Unlike Lord Ganesha, Quetzalcoatl is not currently worshiped in the world and hanging the Quetzal Bird in class should not be regarded as the adoption of a religious symbol.

The students were told that some persons believe Quetzalcoatl will return to the world in the year 2012, but telling students "some persons believe" is not the same as sponsoring that idea in the minds of the children. There is a failure of proof of a First Amendment violation in connection with the teaching of historic Mexican culture. Plaintiffs note that the teacher, Mrs. Pappace, gave no attention "to the study of the Catholic religion, which the people of Mexico have practiced for the past 500 years." The Court has no jurisdictional basis to require that the school district, having taught the children of the historical existence of the Aztecs, their legends and their religion, must also teach the children concerning the later adopted religion of Mexico. Plaintiffs are entitled to no relief on the issue of Quetzalcoatl.

*"How God Messed Up"*

██ Fourth graders in Mrs. Hovey's class were allowed to write original poems of their own choice, and the product was published in booklet form (Plaintiffs' Exhibit 56, "Poetry by 4–H"). Mrs. Hovey did not assign topics for the poem, and the poems represented the individual and original work of the students. Selections of the work to be included in the booklet were made by the students themselves. The first student poem reads as follows:

God messed up . . .
When He made cats
 He gave them the brains of bats
With bloated legs and pointy ears
 and some claws
Made of SPEARS.
 By Gary Palmer, Jr.[13]

---

13. Gary Palmer, Jr. had another equally banal poem published in Exhibit 56, "Poetry by 4–

Another poem in the same publication, with the name of the student obliterated, but apparently not written by Gary Palmer, Jr., is entitled "Mess Up." It reads:

"God messed up when he made dogs

He gave them the brains of frogs (tiny)

He gave them deformed bodies and

Really shrimpy legs and hands

And bushy tails and butts, PU

Guess what, He messed up on frogs, too."

The reasonable person or child reading the book of poems would assume that the authors meant it to be funny. The inclusion of these poems on a subject not dictated by the teacher does not constitute the endorsement of an anti-religious message, and indeed it is not certain that the message is intended to be anti-religious. The poetry may have been inspired by "Ma and God," a poem for children written by Shel Silverstein (deceased May 10, 1999), a distinguished humorous poet for children writing in the tradition of A.A. Milne (Plaintiffs' Exhibit 77), also apparently intending to be funny.[14] Without endorsing any of the poetry, the Court does not perceive that this evidence arises to the level of a promotion or disparagement of a religious concept. Nor does the Court agree, as Defendants claim that an effort by the teacher to leave the poems out of the booklet "would itself have raised Constitutional concerns." (Defendants' post trial brief at 14). No First Amendment violation is found in connection with this very poor poetry.

H"
 "There once was a fatman
 who lived in a trash can
 who outran Pac Man
 all the way to Spokane."

**14.** Silverstein contrasts what Ma says with the actions of God, *e.g.* "God gave us fingers—Ma says "Use your fork." God gave us puddles—Ma says "Don't splash," and after

*The Cemetery Visit*

 With advance written parental consent, the fourth grade students participated in an overnight field trip to the Madden Outdoor Education Center, a facility located in Putnam County operated by BOCES.[15] Plaintiffs' Exhibit 33 is entitled "A Guide to Overnights at Madden." Students and counselors were allowed to camp out overnight and to cook outdoors in a permitted area. The Madden program sponsored by BOCES is an educational program availed of by various school districts in Westchester and Putnam Counties. Its purpose is to allow children and adults to "see one another in new and surprising ways away from the classroom environment" and it seeks to develop group identity and improved communication skills and helps students grow in their ability to take initiative and offer opinions, etc. The program is planned and run by the Madden staff, and includes orientation, instruction in compass use, cemetery/local history experience, evening program on Hudson River lore, and campfire. This program is consistent with the New York State Social Studies curriculum and Science curriculum. The trip to Madden was presented to the parents for approval as representing "plenty of opportunities to take risks: in a safe environment." Parents were invited to go along as monitors.

Exhibit 33 refers to cemetery study as follows:

Cemetery Study: (2 hour/1 class) This program invites students to travel back to the early 1800's to learn what life was like for the settlers of the Madden property. After a brief discussion, students hike to the cemetery to collect data from

other examples, concludes that "And I ain't too smart, but there's one thing for certain—Either Ma's wrong or else God is." Shel Silverstein, *Where the Sidewalk Ends* 119 (New York 1974).

**15.** BOCES is the Board of Cooperative Educational Services which serves Putnam and Westchester Counties.

the gravestones. This data is then used as a basis for a discussion which covers nutrition, food preservation, lifestyle, human physiology, family trees, disease, and family responsibilities. The discussion includes math, science and social studies skills. Following a discussion, each student does a gravestone rubbing. If your group does not have enough time for a full cemetery program, choose the *gravestone* rubbings program described below.

The Madden program contains a number of highly worthwhile opportunities for young children which lack any religious significance. The policy and operation of the Madden Center was not determined by these Defendants, but was under the control of BOCES, a different organization.

Plaintiffs claim that during the overnight trip an employee of BOCES wandered around the campground "waving a stick to magically ward off the danger of animal attack." (Tr. 152). Some of the students believed that there were wolves or bears, and that the stick waving would ward them off. Assuming for purposes of this case that the practice constituted a teaching of a superstitious belief that waving a stick would ward off wild animals, this effort was not an activity for which these Defendants can be held responsible.

As an additional claim arising out of the visit to Madden, the Plaintiffs showed that Ms. Dorna Schroeter, an employee of BOCES, asked one of the students, not a plaintiff in this lawsuit, to lie down on a grave in the Knapp family cemetery. Bedford teachers were present and did not express disapproval or interfere when this other child laid down momentarily on the grave. Other children were permitted to take rubbings from the inscriptions of old tombstones by use of paper and a crayon.

Defendants assert that the activity in the cemetery, especially lying down on the grave, which to this Court seems terminally dumb, was an appropriate teaching practice for social studies because lying down on the grave would show that a full grown person in Colonial times was of much shorter stature. Plaintiffs assert that lying down on the grave involves a desecration, and apparently oppose taking rubbings from tombstones, although this practice is commonly encouraged in the great cathedrals of Europe.

While the educational experience of lying down on a grave seems of doubtful value to the Court, we do not perceive a First Amendment violation by the Defendants of the rights of any of the Plaintiffs by reason of any of the activities which occurred at Madden. Ms. Schroeter was not claimed to be a school district representative. Mere silence on the part of the observing teachers would not constitute a ratification by them or by the school district, and participation in the overnight visit was by parental permission only, and therefore Plaintiffs could opt out. We note that Plaintiffs' Exhibit 33 does warn parents of the intention to have children take rubbings from the tombstones. For the foregoing reasons, Plaintiffs are entitled to no relief with respect to this claim.

*The DARE Program (Drug Abuse Resistance Education)*

Plaintiffs attack the DARE program as a violation of the First Amendment, the Pupil Protection Rights Amendment—20 U.S.C. § 1232h, and New York Public Health Law § 2504. Plaintiff Jon DiNozzi participated in the DARE Program in fifth grade at Pound Ridge Elementary School. The program was sponsored by a police officer, trained for the purpose. Jon DiNozzi testified:

Q. Tell the Court what the program consisted of.

1. Well, [Officer Roffi] went through the different kinds of drugs, what they were, the good consequences and the bad consequences. There never was a 'say no to drugs.' It's your choice, we hope you make the right choice.

(Tr. 28).

The student testified that he was not told by the police officer or anybody

else as part of the DARE Program that drugs were wrong. Steven DiNozzi testified that he participated in the DARE Program in fifth grade before he was opted out of the program by his parents. Steven testified that there was role playing in a drug transaction, and one of the students played the part of the drug seller. The police officer had a "DARE box" where if a student had comments or questions he or she did not want to ask in front of the class the question could be placed in the box.[16]

Officer Roffi, a member of the Mt. Kisco Police Department, testified as part of the Defendants' case. Officer Roffi has been a DARE instructor since 1991, and has served in a number of different schools in Westchester County. She is a certified instructor of the Division of Criminal Justice Services Bureau for Municipal Police of the State of New York, and has completed 80 hours of classroom work. DARE instruction is given in accordance with a copyrighted published curriculum. The DARE Student Workbook for grades 5–6 is in evidence as Defendants' Exhibit 23.

Obviously, reasonable persons could disagree as to the effectiveness of the program and it seems there is no tangible evidence as to whether or not it works. The program is criticized because it does not involve telling the children that drugs are morally wrong. The DARE Program appears to present, as testified to by Officer Roffi, a strong drug and strong anti-violence message (Tr. 786), but apparently is designed to require the students to receive the message by inference rather than by direct statement of the teacher. The purpose of the role playing is said to assist students to learn how to say no, when being pressured by their peers to try tobacco, alcohol and drugs, and the role playing is done so as to give the students the opportunity to say no to an offer by a member of the peer group, thus practicing

to say no in a safe environment. (Tr. 789). Contrary to the testimony of the students, Officer Roffi testified that she does explain to the students that the law prohibits the use and possession of illegal substances. (Tr. 795)

It is apparent that the DARE Program is relatively free of moral overtones, contains no religious emphasis whatsoever, and leaves the "decision" whether or not to use tobacco, alcohol or drugs to the student after evaluating both positive and negative effects. The witness Roffi testified without contradiction that usually the students conclude and verbalize the fact that "under the not using side all of the consequences are positive, under the using side they are all negative." (Tr. 796). She says that students do not find positive responses to the use of the substances. Stressors are discussed and include the possibility of family pressure.

■ In addition to their First Amendment based challenge, Plaintiffs challenge the DARE program as a violation of the Pupil Protection Rights Amendment (PPRA), 20 U.S.C. § 1232h. This Court agrees with Defendants' initial response to this claim, that neither the plain meaning of the PPRA nor the Congressional intent behind the statute provide an implied private right of action. *See McClellan v. Cablevision of Connecticut, Inc.*, 149 F.3d 161 (2d Cir.1998); *Herbert v. Reinstein*, 976 F.Supp. 331, 339 (E.D.Pa.1997) (finding no implied private right of action under 20 U.S.C. § 1232h).

Notwithstanding this conclusion, however, a private right of action exists by reason of 42 U.S.C. § 1983 for the violation of a federal civil rights statute even where the statute does not provide an express or implied private right of action. *See Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The Supreme Court has provided a three prong test to determine whether a federal statute gives rise

---

**16.** At St. Patrick's parochial school, which serves the same geographic area, the DARE Program was also given, and the students were able to opt out (Tr. 77).

to a federal right enforceable under § 1983:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*King v. Town of Hempstead*, 161 F.3d 112, 114 (2d Cir.1998) (quoting *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997)); *see also Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

In determining whether plaintiffs are intended beneficiaries of the provisions of 20 U.S.C. § 1232h, the first prong of this test, the Court looks to the plain text of the statute, which provides, in relevant part, that "[n]o student shall be required, *as part of any applicable program,* to submit to a survey, analysis or evaluation that reveals information concerning.... (2) mental and psychological problems[,] ... without the prior consent of the student ... or ... parent." 20 U.S.C. § 1232h(b) (emphasis added). Section 1221 of the General Education Provisions Act, which includes the PPRA, defines the term "applicable program" as "any program for which the Secretary [of Education] or the Department [of Education] has administrative responsibility as provided by law or by delegation of authority pursuant to law" and "includes each program for which the Secretary or Department has administrative responsibility under the Department of Education Organization Act [20 U.S.C.A. § 3401 *et seq.*] or under Federal law effective after May 4, 1980." 20 U.S.C. § 1221(c)(1). The Department of Education explicitly interprets the PPRA to apply only to schools that receive and use federal funds, from the Department, in connection with the use or administration of surveys, analysis or evaluations concerning one or more of the areas listed in the PPRA. *See* 60 Fed.Reg. 44,696 *et seq.* (1995) (to be codified at 34 C.F.R. pt. 98).

As the evidence is undisputed (Plaintiffs' Exhibit 74) that no federal funds were used in the DARE program, the Court holds that plaintiffs are entitled to no relief under any of their claims asserted pursuant to the PPRA.

■ Plaintiffs contend that the DARE program is a health service under New York Public Health Law § 2504, which requires the district to obtain parental consent as a prerequisite for student participation. Plaintiffs' expert witness Dr. Coulson testified that participating in the DARE Program constitutes non-directive psychotherapy. He criticizes the program as, "[t]he idea is to provoke children who are not aware of having a problem with respect to drugs, children for example, who may have been reared under an absolute morality where they are taught 'don't even think about doing drugs' to provoke them into thinking about doing drugs and give them what purports to be a method for deciding for themselves whether or not to deal with drugs." (Tr. 485). This Court is not required to resolve the validity or the desirability of the DARE Program. We note that the program has been in common use throughout the country for some period of time without having been found unlawful by any court. It may well be that there are better ways to teach abstinence from illegal drugs, but the evidence does not support a conclusion that the DARE Program is a "health service" within § 2504 of the New York Public Health Law.

No First Amendment or other violation appears to have resulted from the DARE Program. Plaintiffs are entitled to no relief as to this issue.

### Reverend Nancy Weber

Rev. Nancy Weber is a self-proclaimed psychic, although her psychic powers did not extend to predicting the date on which the trial testimony would be concluded. She is a minister in the Life Spirit Congregational Church. She conducted an activity at the elementary schools intended to improve creativity, learning and memory. This involved exercises intended to improve the function of the right hemisphere of the brain, which Rev. Weber believes can be stimulated and improved. She led the children in exercises of concentration with eyes closed.

Here again, Rev. Weber's appearance at the school was as a result of a random act, and not a part of any designed curriculum and did not involve any decision making by the Superintendent, principal, or the Board of Education. She met the school nurse at a social function in New York or Connecticut at somebody's house. As a result of a chance social conversation with the school nurse "about health and learning and research supports that there is an integration between a healthy body and the ability to learn and be less stressed while you are learning," she was invited to attend as a guest lecturer and conduct exercises.[17] The subject of her teaching was that "the right hemisphere of the brain is the part that takes all the complex patterns and makes associations allowing us to grasp concepts which I believe helps us learn anything." (Tr. 399). The exercise included having the children draw with the non-dominant hand with their eyes closed.

Plaintiffs have produced no evidence that Rev. Weber, during her brief visit to the school, taught any religion or performed intuitive counseling, exercised her psychic powers or engaged in telepathy. The argument is that "the attempt to perform right brain stimulation constitutes an invasion of privacy of the minor Plaintiffs

and their parents." In Father Pacwa's expert report (Exhibit 73) he observes that "the notion that one's right brain must be stimulated so as to overcome 'linear thinking' with the left brain is quackery."

The entire Nancy Weber lecture may well have been nothing but humbug. However, the Court does not believe that this visiting lecturer required the students to engage in a "bogus mystical experience" as charged, and concludes that on the totality of the evidence it did not rise to the level of a First Amendment violation. Plaintiffs are entitled to no relief as to this issue.

### Peer Facilitator Program

▇▇ The school arranged for peer facilitators, students already attending the high school, to conduct orientation for students about to move from the middle school to the high school. Apparently these peer facilitations did not enjoy complete faculty supervision at all times, and students in the middle school met with more sophisticated students from the high school where they engaged in unsupervised discussion of such topics as sex, drugs, rock and roll music, parties and Monica Lewinsky. A role playing story about "Mark and Lisa" involving pressure to engage in sex was introduced into the discussion without faculty supervision.

This is claimed to be a psychotherapeutic technique in violation of the New York statute forbidding medical treatment without parental consent. The evidence reveals, and this Court finds, that the student-led discussions that occurred during the Peer Facilitator Program did not rise to the level of "medical" or "health services" within the plain meaning of the text of New York Public Health Law § 2504. Thus, the Court refuses to order the district to obtain parental consent from students who participate in the Peer Facilitator Program. It is also alleged that the

---

**17.** Notwithstanding the casual method by which Rev. Weber found her way into the instructional program, she was paid a modest stipend from school district funds for her time and travel, as were the Yoga Guy and the Rock Hound.

Peer Facilitator Program violates the PPRA, 20 U.S.C. § 1232(h). However, there is no evidence that federal funds were expended in connection with the program, so for the reasons stated earlier with regard to the DARE program, that claim must be rejected. No First Amendment violation is or could be claimed as to this activity. Plaintiffs are entitled to no relief with respect to the Peer Facilitator Program.

*Meditation Programs*

Plaintiffs object to other non-yoga meditation programs. The evidence showed that lights were turned off and students were asked to imagine themselves in a strange place, or that their bodies were filling with blue liquid, and were told to empty their minds. Plaintiffs contend that taped music was played and deep breathing was incorporated into the meditation period.

Plaintiffs contend first that this meditation constitutes a form of psychotherapy barred by the state and federal statutes discussed *supra,* unless consented to by the parents. Father Pacwa testified (Tr. 598) that this was a form of hypnosis. He objected first because persons without training in psychology were practicing hypnosis and was concerned on a religious issue because "letting people get involved in that kind of hypnotic exercise would introduce them to something either by suggestion psychologically or by actual spirit contact, and that would be evil."

The credible evidence in the case does not support a finding of actual spirit contact. The actual exercises may be useless, but do not rise to the level of a First Amendment violation and Plaintiffs have failed to show with respect thereto that they are entitled to any relief under the state or federal statutes discussed earlier.

*Prayers to Mother Earth and the Earth Day Liturgy*

This issue started out innocently enough. The New York State Legislature by statutory provisions going back as far as 1888 as amended from time to time has authorized the commemoration of "Conservation Day" on the last Friday in April of each year. Subparagraph 2 of § 810 of the Education Law now reads as follows:

2. It shall be the duty of the authorities of every public school in this state to assemble the pupils in their charge on that day in the school building, or elsewhere, as they may deem proper, and to provide for and conduct (1) such exercises as shall tend to encourage the planting, protection and preservation of trees and shrubs, and an acquaintance with the best methods to be adopted to accomplish such results, and (2) such lectures, pictures or tours, as shall tend to increase the interest and knowledge of such pupils in the fish and wild life, soil and water of the state.

The statute, in subparagraph 3, allows the Commissioner of Education to prescribe a course of exercises and instruction. Through the years, Conservation Day has come to be known as Earth Day. The worship of the Earth is a recognized religion (Gaia), which has been and is now current throughout the world. The liturgy of Earth Day at Fox Lane High School according to all the evidence in the case, went far beyond compliance with Education Law § 810, and evolved into a proceeding which takes on much of the attributes of the ceremonies of worship by organized religions, including that of the Plaintiffs. Some of what was done was truly bizarre. Plaintiffs' Exhibit 28 is the April 1997 issue of the high school paper, *The Forum.* In reporting on the prior year's Earth Day ceremony, *The Forum* states, "[a]lso, as in every year, symbolic gifts were presented to the earth by the representatives of each class in the form of a speech." The ceremony included the erection of "symbolic structures," equal to an altar, and a chorus of drums playing throughout the presentations. The Earth was deified and students were urged to

"do something that would make Mother Earth smile." The students assembled outdoors in a circle under the leadership of an art teacher, Dale Saltzman, who designed the program. A large (5 feet in diameter) globe was held up by three bamboo sticks in a green circle in front of the high school as a focal point of the worship service. In addition to a musical performance, several faculty members gave speeches.

As part of Exhibit 28, Plaintiffs presented a document issued March 5, 1996, by Mr. Saltzman. This memorandum pointed out with respect to Earth Day that, "[s]ome years the event has been small and quiet, and other years we have had great pomp and pageantry. At the core of each gathering has been and will continue to be an honoring of the earth as a home for all of us." The memorandum continues:

> The concepts enjoined and reinforced each year in the structure of the assembly itself are the Honoring of the Elders. Metaphorical gifts from the class officers to the earth and planting for the future. The program is always filled out with speakers, skits, demonstrations, dancers, drummers, poets or the like, with an ecological theme, but the core idea of respect for the earth is the concept to be driven home.

On at least one of the Earth Day celebrations, Mr. Saltzman told the assembled students and senior citizens who had become part of the ceremony that, "[w]e came from the earth, we are part of the earth, and we are all involved in this cycle. One day we will become [dead] and then we'll go back to the earth." (Tr. 25) This is clearly religious teaching. ("*pulvis es et in pulverem reverteris*" (Genesis 3:19)). Tombstones were used one year at the ceremony, inscribed with the names of extinct birds and animals. On one Earth Day occasion, Mr. Saltzman told the assembled group that there were too many people on this earth and we need to do something about it. The validity of this observation is far from clear, the Malthusians having failed to confirm their theory over two centuries.[18] It is directly contrary to the teaching of *Genesis I*.[19]

To state this unproven fact as an absolute violated the school district's rule on academic freedom,[20] and involved the school district in teaching a doctrine directly contrary to the views of Roman Catholic students and many others. As Father Pacwa pointed out, "the implication would be that you would have to use some sort of birth control to stop this. Also it takes a stance, a moral stance, on what is the problem of the world today, namely, too many people, instead of dealing with other moral issues of more political nature that prevent food from getting to people that need it." (Tr. 593).

At times other than the Earth Day liturgy, the school sponsored prayers and the recital of a creed worshiping the Earth. Plaintiffs' Exhibit 62 is in two parts: a tape recording entitled "Listening to Nature," which intersperses prayers and invocations sonorously uttered along with background sounds of forest, and ocean; and a book entitled "Listening to Nature" by Joseph Cornwell (1987). The tape was played for an entire class of twelve and thirteen year old children. Contained is a creed: "This is what we believe. The Mother of us all is the Earth. The Father is the Sun. The Grandfather is the Creator who bathed us with his mind and gave life to all things. The Brother is the beasts and trees. The Sister is that with wings. We are children of the earth and do it no

18. Essay on the Principle of Population by Thomas Robert Malthus, 1798.

19. "God blessed them [male and female], saying: increase and multiply and fill the earth and subdue it, and rule over the fishes of the sea and the fowls of the air, and all living

creatures that move upon the earth." 1941 Douay Trans.

20. "Indoctrination of any matter of faith or opinion will not be tolerated." Plaintiffs' Exhibit 68 for id. quoted by the witness Young (Tr. 328).

harm in any way, nor do we offend the Sun by not greeting it at dawn. We praise our Grandfather for his creation. We share the same breath together, the beasts, the trees, the birds and the man." This creed originates with the Taos Indians, and is a clear example of a religious teaching within Judge Adams' definition quoted *supra.* This activity was a direct presentation to the children of an Earth-centered religious belief. Further religious motifs are found in the book (Exhibit 62). While Mrs. Funari denied she made the book itself available to the students (Tr. 709), she conceded that the prayers in the book are on the tape played for the class (Tr. 711). At page 25 a poem entitled "The Birds of the Air" contains the statement, "For this green earth is our Mother, hidden in the sky is the Spirit above." Clearly, this is also a religious teaching. Similarly, on page 65, children were advised, "When you need to cut down a tree or remove a plant from your garden, reflect on this prayer: 'We know that we all are children of the same Mother Earth, of our Father Sun. But, we also know that one life must sometime give way to another, so that the one great life of all may continue unbroken. So we ask your permission, we obtain your consent for this killing.'" This prayer is said to have originated also with the American Indians and is tendered to the children as "promoting understanding that our human desires should be tempered with willingness to defer to the needs of other living things." (Exhibit 62 at p. 65).

The children were also given a Winnebago Indian prayer: "Holy Earth Mother, the trees and all nature are witnesses of your thoughts and deeds." On the same page students were advised, "You can use the following prayer similarly: 'I feel Thy presence in this landscape which draws my heart so close to Thee.'" On page 68, children were confronted with the following: "The first peace, which is the most important, is that which comes within the souls of people when they realize their relationship, their oneness, with the universe and all its powers, and when they realize that at the center of the universe dwells the great Spirit, and that this center is really everywhere, it is within each of us." Again, on page 71: "Trees, standing firm, hold the secret of inner power. Give us, when tested, strength to endure. Mountains, remote and still, hint at higher worlds unseen. So may our lives be, soaring and serene. Rivers seek passage, unhindered by rock or tree. So may our lives flow steadfast toward the sea! Mother, we thank you, your joy shines in everything! Open these channels, so the world once more may sing." Again, on page 72 the children were told: "Like the sage in the story, we can learn valuable lessons from nature. Nature is an expression of God; or, if you prefer, of the creative force and intelligence in the universe. Since we are created by the same power as nature, we can use nature as a mirror in which to reflect on truths about ourselves."

Although Plaintiffs did not call our attention thereto, Exhibit 62 includes, at page 74 near the end the well known prayer of St. Francis of Assisi. Notwithstanding St. Francis, the essential thrust of the book and the tape made from the book seems to be the promotion of Earth worship and prayer to the Earth, which offends both aspects of the First Amendment. Superintendent Dennis testified that he would bring a teacher up on charges if he or she told the children to pray to Ganesha or to the Worry Dolls. (Tr. 461). However, when confronted with the prayer to Mother Earth in Exhibit 62, he testified:

Question: [Y]ou remember the prayer, Pray to Mother Earth talked about not offending the sun, did you hear that prayer?

Answer: Yes.

Question: Should that prayer be said in a public school?

Answer: I didn't have any problem with that.

\* \* \* \* \* \*

Question: Would you have a problem with students presenting gifts to the Earth in an Earth Day ceremony?

Answer: I had no difficulty at all with the activity that we ran at the high school.

Question: That would include offering gifts to the Earth?

Answer: Right. I had no problem with that.

(Tr. 465–466).

*Invasions of Family Privacy*

■ Plaintiffs allege that defendants have conducted various activities which although lacking religious overtones, violate the plaintiff-parents' Fourteenth Amendment privacy right to exempt their children from educational activities which interfere with their right to direct the upbringing of their children. In *Immediato v. Rye Neck School Dist.*, 73 F.3d 454, 462 (2d Cir.1996), *cert. denied*, 519 U.S. 813, 117 S.Ct. 60, 136 L.Ed.2d 22 (1996), our Court of Appeals recognized the claimed right of a parent to direct the upbringing of his or her children, but held that any challenged activity be analyzed only under the minimal rational basis standard of review. Thus, the defendants need only prove that the activities at issue are based on a legitimate state interest and that the activities are rationally related to furtherance of that objective. *Id.*

Plaintiffs challenge the following activities: Giving children the homework assignment of observing and reporting on the activities of family members; administering the Myers–Briggs personality test; telling the students to keep a journal which could include their most intimate thoughts on private matters; implementing the Yale Decision Making Program; and administering counseling to students. Plaintiffs do not seek to stop these activi-ties outright, but rather, seek advance parental notification of these activities with the ability to "opt-out" their children as they see fit.

In *Immediato*, our Court of Appeals held that as the Supreme Court has recognized, the state has a "compelling" interest in educating its youth, to prepare them to participate effectively and intelligently in our open political system, and to be self-reliant and self-sufficient participants in society. 73 F.3d at 461. The homework assignment and the journal activity were writing exercises that were clearly educational in nature. Plaintiffs concede that students were told they had the right to staple-close any personal and private portions of their journals before they were read by the teachers. OPCALS at 18–19. These writing assignments, although intrusive in nature, do further the state's compelling objective of education, and thus do not violate plaintiffs' Fourteenth Amendment rights.

The evidence also reveals that contrary to plaintiffs allegations, the Myers–Briggs Personality Test was, and is, conducted at the district schools only after advance parental notice is mailed to parents, with a right to opt-out their student from testing.[21] (Tr. at 338). Regardless of the opt-out opportunity, student testing is well within the realm of legitimate educational goals and thus plaintiffs claim on this issue does not rise to the level of a constitutional or statutory violation.

The Yale Decision Making Program (Plaintiffs' Exhibit 18) is a program implemented as part of the sixth grade curriculum, conducted over several weeks in twelve sessions of 40–minute periods. (Tr. at 363). This program, which was developed by the Department of Psychiatry at Yale University, was created to attempt to help children make good choices and good decisions, to weigh the nature of the deci-

---

**21.** This advance notice and opt-out ability also makes relief claimed under N.Y. Public Health § 2504 moot.

sions they make, to access different types of data, and to make judgments that are productive and proper choices. (Tr. at 362). The program contains lessons on stress and stress management and also includes a relaxation exercise. The Court finds that the Yale Decision Making Program rationally furthers the district's objective of educating students to make informed decisions and to be self-reliant and self-sufficient participants in society.

Plaintiffs also appear to argue for a blanket opt-out right to all objectionable activities within the district. The Court fails to find any constitutional basis for such a right. Assuming, *arguendo*, that the *Immediato* case grants such a right, this Court finds the testimony of Dr. Dennis on the district's reasons for refusing to offer a parental opt-out program, credible and persuasive in a context not involving First Amendment rights:

> The notion of parental opt out requires that parents know in somewhat exhaustive detail prior to any kind of teaching episode what is going to be occurring, what materials will be used. And I assume a presumption of that is that they would then have the right to have their [children] participate, after which—so after being given, for example, notice of a particular activity or lesson, the teacher would need to do so in enough time to give the parents an opportunity to respond; the parent might then choose not to have his child participate; the teacher would have to then construct an alternate assignment which presumably would need to have the parent approve as well. This could go on and on and literally tie the hands of education to proceed. So I couldn't support that kind of general opt out.

(Tr. at 455). Based on this evidence, this Court finds that the district's refusal to offer this general opt-out right is rationally related to the furtherance of the district's educational objectives and therefore lawful as to the non-First Amendment issues in the case.

This finding, however, does not limit defendant's otherwise legal obligation to obtain parental consent. The most notable of these obligations is New York Public Health Law § 2504 which requires, in relevant part, the district to obtain parental consent prior to providing health or medical services. Thus, to the extent the district engages in any student counseling, it is required by that statute to obtain parental consent if such counseling is medical or health related. Plaintiffs have failed to prove in the context of this case that such counseling was imposed without consent on their children. New York Public Health Law § 2504 applies to the issue. This issue of student counseling having been decided under New York State statutory law, this Court need not address whether the challenged activity violates plaintiffs Fourteenth Amendment parental right to privacy. *See Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter").

### CONCLUSION

Plaintiffs are entitled to the entry of a final injunction which would: (1) prevent school sponsorship of worship of the Earth or continued presentation of a liturgy addressed to the Earth as if it were the Creator, or divine, including prayers of any kind to the Earth, whether or not derived from the culture of the American Indians, or as set forth in Plaintiffs' Exhibit 62; (2) remove the Worry Dolls from the school system and refrain from sponsoring charms or suggesting that tangibles have supernatural powers; (3) prohibit any direction to a student to make a likeness or a graven image of a god or religious symbol; and (4) direct the adoption of a published policy which will contain clear instructions to teachers and others to implement within the school system the

Supreme Court standards set forth in the cases quoted earlier in this decision, in order that the school district shall remain neutral towards all religions, neither sponsoring nor disparaging any religious belief, and shall not coerce any student to participate in religion or its exercise or to violate any religious precept held by a child or his or her parents. The policy shall provide that persons teaching students, who are not regular members of the faculty, such as psychics, yogis and rockhounds, shall be informed of these limitations before being invited.

In all other respects, all relief shall be denied.

Counsel are directed to meet and discuss the form of a final judgment and may agree on the form without conceding the correctness of this decision or waiving any appellate rights. The Court will not approve any injunction which requires the Court to retain any generalized continuing jurisdiction over the Bedford School District beyond enforcing its specific terms.

Plaintiffs are prevailing parties, at least in part, and are entitled to recover their legal fees and costs to the extent attributable to that portion of the claims as to which they prevailed. Counsel if so advised may submit an application setting forth the total lodestar and the portion attributable to those services as to which Plaintiffs prevailed, which application shall be served and filed with the Court on or before June 4, 1999. Opposing papers, if any, shall be received by June 18, 1999, at which time the fee application will be regarded as fully submitted for decision.

A proposed final judgment shall be settled on notice or submitted pursuant to waiver of notice to the Court on June 18, 1999, or earlier.

SO ORDERED.